2009 UT 78

**UNION OIL COMPANY OF CALIFORNIA, Petitioner,**

v.

**UTAH STATE TAX COMMISSION, Respondent.**

No. 20080068.

Supreme Court of Utah.

Dec. 8, 2009.

David J. Crapo, Layne T. Smith, Salt Lake City, for petitioner.

Mark L. Shurtleff, Att'y Gen., Clark L. Snelson, Asst. Att'y Gen., Salt Lake City, for respondent.

WILKINS, Justice:

## INTRODUCTION

¶ 1 The Union Oil Company of California (Unocal) petitioned this court for review of a Utah State Tax Commission (Tax Commission) decision holding that Unocal was not entitled to a refund of severance tax payments. We affirm the decision of the Tax Commission in part and reverse in part.

## PROCEDURAL BACKGROUND

¶ 2 In 1997, Unocal filed for a refund of the severance taxes it paid for the years 1994 through 1997. The Commission paid the refund, then sent it to the Auditing Division to be audited. The Auditing Division determined that the original tax filings were correct, and that the refund had been provided in error. Consequently, in 2000 the Auditing Division sent Unocal a deficiency notice for the 1994–1997 period (First Assessment Period). Unocal petitioned for a redetermination, which the Tax Commission stayed pending the resolution of a severance tax appeal by ExxonMobil, which was then pending before us. Unocal filed an amicus brief in the *ExxonMobil* matter. We issued our opinion in November of 2003 in favor of ExxonMobil. In the opinion we expressly limited any retroactive application to ExxonMobil. *Exxon-Mobil Corp. v. Utah State Tax Comm'n,* 2003 UT 53, 86 P.3d 706. Several amici parties, including Unocal, petitioned for rehearing seeking full retroactive application of the decision. We denied rehearing.

¶ 3 In 2004, the Auditing Division issued a second severance tax deficiency notice to Unocal, along with a conservation fee deficiency notice, for the years of 1998 and 1999 (Second Assessment Period). Unocal appealed the new deficiency assessment to the Tax Commission. The Tax Commission consolidated the appeal with Unocal's first pending appeal and held a formal hearing in 2007.

The Tax Commission upheld the deficiency assessments against Unocal in a final decision issued on December 24, 2007. Unocal then petitioned us for review, which we granted.

## FACTUAL BACKGROUND

¶ 4 During the period of January 1994 to June 1999, Unocal was the designated Unit Operator for oil and gas production from the Lisbon Unit, located in San Juan County, Utah. The Lisbon Unit is comprised of federal and state oil and gas leases. Unocal operated multiple wells within the Lisbon Unit and operated a processing facility, the Lisbon Plant, just outside the legal parameters of the Unit. The oil and gas extracted from within the Lisbon Unit was "sour," meaning that it included various contaminants, including several natural gas liquids (NGLs) that could be separated out and sold. The audits at issue in this review involve the production of oil, gas, and NGLs from the Lisbon Unit.

¶ 5 Unocal was required by state statute to pay severance taxes on the value of the oil and gas it extracted under its lease agreements. *See* Utah Code Ann. §§ 59–5–101 to –215 (2000).[1] The statute provided the details for valuing the oil and gas for taxation purposes, including allowing for several valuation methods. *Id.* § 59–5–102. For the First Assessment Period, Unocal valued the oil and gas at the point of sale in its original severance tax calculations, but later filed for a refund based on calculations using the net-back valuation method. Though the Tax Commission initially paid the refund, the Auditing Division determined that the refund was in error and issued a deficiency notice using different valuation methods—the contract prices at the Lisbon Plant tailgate for the oil and gas, and the net-back method for the NGLs. The NGL calculation included a processing costs allowance of two-thirds. For the Second Assessment Period, Unocal used the net-back method of valuation. The Auditing Division issued a deficiency notice,

---

1. These sections have since been amended. We cite to the version in effect during the relevant time period.

relying on the posted prices for "sweet" oil produced in a different field and using the tailgate sale price for the gas and NGLs.

¶ 6 In addition, Unocal was eligible for a statutory annual tax exemption on the combined taxable value of its oil, gas, and NGLs. The Auditing Division applied the full tax exemption in 1998 and prorated the exemption at fifty percent in 1999 because Unocal was the Lisbon Unit operator only until June 1999.

¶ 7 Unocal challenges the Auditing Division's tax valuation methods and the proration of the annual exemption.

## STANDARD OF REVIEW

■ ¶ 8 We review the Tax Commission's interpretation of case law and statutes for correctness, according the Tax Commission no deference. *See ExxonMobil Corp. v. Utah State Tax Comm'n*, 2003 UT 53, ¶ 10, 86 P.3d 706.

## ANALYSIS

### I. THE PROSPECTIVE RELIEF DECLARATION OF *EXXONMOBIL*

¶ 9 We first address Unocal's request that we overturn our express limitation in *Exxon-Mobil* and allow retroactive application of its holding to this case.

¶ 10 While Unocal's appeal before the Tax Commission was pending, we decided *Exxon-Mobil Corp. v. Utah State Tax Commission*, 2003 UT 53, 86 P.3d 706. In that case, we interpreted the statutory definition of the appropriate point in oil and gas production for calculating the state severance tax. Under the Utah Code, those persons owning interests in the production of oil and gas from within the state are required to pay a four percent severance tax to the state "of the value, at the well, of the oil or gas produced, saved, and sold or transported from the field where the substance was produced." Utah Code Ann. § 59–5–102(1)(a) (2000). The statute defines "value at the well" as "the value of oil or gas at the point production is completed." *Id.* § 59–5–101(19). ExxonMobil argued that produc-

tion, as specified by the statute, was complete when extraction was complete, thus valuation should occur at the "point of removal from the earth," when the oil and gas price would be lower due to the impurities still within. *ExxonMobil Corp.*, 2003 UT 53, ¶¶ 7, 12, 86 P.3d 706. The Tax Commission rejected this argument and asserted that valuation would occur at the "point of actual sale," which typically occurs after impurities are removed from the oil and gas resulting in a higher contract price. *Id.* ¶ 7. We held that valuation for severance tax purposes should occur "in the immediate vicinity of the point at which the oil or gas is physically removed from the earth," but that "to qualify as the point at which production is complete, that point must be one at which sales of the oil and gas may actually occur." *Id.* ¶ 19. In addition, we gave our holding limited application, recognizing that "retroactive application could result in large refunds of taxes already collected and spent by governmental entities." *Id.* ¶ 23. Thus, with the exception of ExxonMobil we limited the holding to prospective application "as to other parties who may have refund requests, deficiency proceedings, or similar matters pending before the Tax Commission." *Id.* ¶ 24.

¶ 11 Following *ExxonMobil*, Unocal's appeal recommenced before the Tax Commission, and Unocal sought to have the *Exxon-Mobil* holding applied to its severance tax assessments. The Tax Commission declined to do so because Unocal's appeal was pending when *ExxonMobil* was decided and was therefore outside the scope of the limited holding. Unocal asks us to overrule the limitation on retroactivity in order to apply the *ExxonMobil* holding to its appeal.

■ ¶ 12 The Tax Commission opposes our consideration of Unocal's request, in part on the theory of res judicata. But we need not wrestle with the application of res judicata. As the court of last resort on matters of state law, we are always at liberty to review, and revise, our prior decisions. While legal principles like res judicata play an important role in the predictability and stability of our legal framework, they always bow to the wisdom of time when a prior action or decision is truly in need of change.

¶ 13 We are convinced that our decision in *ExxonMobil* requires some modification and clarification. The concern for upheaval caused by requiring governmental units to repay already committed and spent funds is still a valid one, and our express declaration that the holding in *ExxonMobil* is to be limited to prospective matters still applies in part. However, as explained hereafter, we address questions of application differently.

## II. APPLICATION OF *EXXONMOBIL* TO PENDING PROCEEDINGS

 ¶ 14 Unocal alternatively asks us to clarify the scope of *ExxonMobil's* retroactivity limitation. This task requires that we look first to the plain language used by this court to determine the scope. *See Kennecott Corp. v. Utah State Tax Comm'n*, 862 P.2d 1348, 1350 (Utah 1993) ("Hence, the opinion's plain language dictates that it apply only to those litigants and only for . . . the tax year for which the suit . . . was brought.").

¶ 15 In *ExxonMobil* we stated, "whether in refund requests or deficiency proceedings, as to all but ExxonMobil the rule announced today is to have prospective application only." *ExxonMobil Corp. v. Utah State Tax Comm'n*, 2003 UT 53, ¶ 23, 86 P.3d 706. We restated in the conclusion, "Although Exxon-Mobil is entitled to further adjudication of its claim for a refund, as to other parties who may have refund requests, deficiency proceedings, or similar matters *pending* before the Tax Commission, our holding is to apply prospectively only." *Id.* ¶ 24 (emphasis added).

 ¶ 16 The Tax Commission interprets our holding, and the word "pending," to refer to the period being taxed, rather than the time at which proceedings are commenced before the Commission. Thus, proceedings based on taxes accrued during periods prior to *ExxonMobil* would be immune from application of its holding, regardless of when they were initiated. The Tax Commission cites *American Trucking Ass'n, Inc. v. Smith*, 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990), as support for this contention. In *American Trucking*, the United States Supreme Court indeed reasoned that where the federal taxation statute had been

declared unconstitutional, "the critical event for prospectivity is the occurrence of the underlying transaction, and not the payment of the money therefore." *Am. Trucking Ass'n, Inc.*, 496 U.S. 167 at 188, 110 S.Ct. 2323 (internal quotation marks omitted). However, the Court also recognized that its retroactivity determination was "a matter of federal law" and that "[w]hen questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions." *Id.* at 177, 110 S.Ct. 2323. We agree. "[W]hen the rule involved is one of state law, . . . the decision of prospectivity or retroactivity belongs to the state." *Kennecott Corp.*, 862 P.2d at 1351. We are not bound by the court's reasoning in applying federal tax law. We make our own retroactivity determinations in matters of state law. The holding of *ExxonMobil* expresses our decision to base prospective application on the date of the tax refund or deficiency proceeding, declining to retroactively apply the holding to currently pending proceedings, except for those matters initiated by ExxonMobil. Additionally, matters initiated and resolved prior to *ExxonMobil* are not subject to retroactive application. Only matters commenced subsequent to *ExxonMobil* will be subject to the articulated holding.

¶ 17 Accordingly, because the Tax Commission issued the deficiency notices against Unocal for the Second Assessment Period after the announcement of *ExxonMobil*, they were commenced after *ExxonMobil* and were not "pending." Therefore they are not subject to analysis under the rule announced in *ExxonMobil*.

¶ 18 The Tax Commission contends that because the Second Assessment Period deficiency appeal was consolidated with the deficiency proceeding for the First Assessment Period, which was pending at the issuance of *ExxonMobil*, the Second Assessment Period deficiency appeal should also be considered part of the "pending proceedings." This argument is unpersuasive. The fact that the proceedings were consolidated only confirms that they were separate matters at the outset, one of which was commenced before *ExxonMobil* and one afterwards. We are

unwilling to apply a relation back analysis to such a situation. We thus hold that the deficiency proceeding against Unocal for the Second Assessment Period was not pending at the issuance of *ExxonMobil* and is subject to the holding announced therein.

¶ 19 Conversely, the deficiency proceeding against Unocal for the First Assessment Period was pending at the issuance of *Exxon-Mobil* and clearly falls within the limitation on retroactivity. However, deficiency assessments do not implicate the same revenue concerns as refund requests. As we explained, albeit briefly, in *ExxonMobil,* our limitation on retroactivity was to "protect the solvency of governmental entities" from the potential burden of "large refunds of taxes already collected and spent." 2003 UT 53, ¶ 23, 86 P.3d 706. However, as Unocal argues here, if a taxpayer prevails in challenging a deficiency assessment, the government would never be required to pay out funds already collected. The only possible adverse result suffered by the state in a deficiency assessment action is a failure to receive additional tax revenue from the taxpayer.

¶ 20 Given this distinction and the implications for the public treasury, we are persuaded to refine our limitation on retroactivity with respect to deficiency assessment matters pending at the time of our decision in *ExxonMobil.* Deficiency assessments issued by the Tax Commission but unresolved at the time of our decision in *ExxonMobil* fall within the ambit of the *ExxonMobil* analysis. As before, the *ExxonMobil* holding will not apply retroactively to those pending matters that are taxpayer initiated refund requests. Consequently, the deficiency assessments pending against Unocal for the First Assessment Period are subject to *ExxonMobil.*

## III. REMAINING VALUATION ISSUES

■ ¶ 21 Finally, Unocal appeals a number of valuation determinations in the Tax Commission's decision. These determinations were made without application of *ExxonMobil's* point of valuation guidance. Because we hold that both of Unocal's appeals are subject to the valuation definition set forth in *ExxonMobil,* we remand the valuation issue stemming from the point of valua-

tion to the Tax Commission for consideration under the analysis and rule as set forth in *ExxonMobil.* We affirm the Tax Commission as to the remaining valuation questions.

■ ¶ 22 We discuss only Unocal's appeal of the application of the annual exemption for guidance to the Tax Commission and parties generally. Utah Code section 59–5–102(2)(a) exempts "the first $50,000 annually in gross value of each well or wells" from the severance tax and provides that the exemption is "to be prorated among the owners in proportion to their respective interests." Utah Code Ann. § 59–5–102(2)(a) (2000). In accordance with the statute, the Commission gave Unocal a single exemption for all wells located within the Lisbon Field for each year through 1998. In 1999, because Unocal sold its interest in the Lisbon Field halfway through the year, the Commission reduced the annual exemption by fifty percent.

¶ 23 Unocal contends that this application of the exemption was error because under the statutory language it is entitled to the full exemption for each individual well within the Lisbon Field and should receive the full exemption for 1999 where the first $50,000 in gross value was produced while Unocal retained its interest in the production.

¶ 24 In considering Unocal's contentions, we look to the statute's plain language. *Evans v. State,* 963 P.2d 177, 184 (Utah 1998). The statute exempts from severance taxation "the first $50,000 annually in gross value of each well or wells *as defined in this part.*" Utah Code Ann. § 59–5–102(2)(a) (1992 & Supp. 1996) (emphasis added). "Well or wells" is defined as "any extractive means from which oil or gas is produced or extracted, located within an oil or gas field, and operated by one person." *Id.* § 59–5–101(20) (2000). As the Commission points out, this statutory definition does not distinguish between the single or plural, but acknowledges that oil and gas may be extracted from a field by a single well or a number of wells. Thus, the Commission concluded that "the operation of a number of wells to extract oil and gas would appear to be a single *means* of extraction." That the exemption applies to extractive means "located within an oil or gas

field" indicates that an operator of more than one field would receive the exemption for each field. In addition, the statute contemplates an extractive means operated by one person or entity. During the time of its operation, Unocal was the sole operator of the Lisbon Field. Thus, according to the plain language of the statute, and supported by the fact that tax exemptions are to be construed narrowly,[2] we agree with the Tax Commission that the annual exemption is to be applied as a "field exemption" and not as a "well exemption" to each individual well.

¶ 25 The statute goes on to provide that the exemption "be prorated among the owners in proportion to their respective interests in the production or in the proceeds of the production" of "the first $50,000 annually in gross value." *Id.* § 59–5–102(2)(a). Unocal contends that the legislature intended that the exemption be prorated among the parties who share ownership when "the first $50,000" of oil or gas is extracted from the wells, rather than among the parties who share ownership of the entire annual production. Were this to be the case, a party who had an ownership interest in oil and gas production only during the latter part of a year, as here, would not be entitled to any portion of the exemption, though it bore its share of the costs and burdens of production. We believe such an interpretation runs contrary to the accepted principle that "taxes should be imposed equally and without discrimination so that everyone bears his fair share of the tax burden." *See Parson Asphalt Prods., Inc. v. Utah State Tax Comm'n,* 617 P.2d 397, 398 (Utah 1980). Instead, each owner in the *annual* oil and gas production is entitled to a proportional share of an exemption of the first $50,000 from production. This analysis was applied by the Tax Commission, and we therefore affirm.

¶ 26 The other valuation issues presented by Unocal are within the discretion of the Tax Commission to determine. As we find no error in the Tax Commission's determinations, we remand only the question arising from the point at which the oil and gas are to be valued for consideration of the appropriate valuation as set forth in *ExxonMobil.*

¶ 27 We note that the centerpiece of the *ExxonMobil* controversy has been the circumstances under which it is subject to retroactive application. Our resolution of the controversy here does not actually concern *prospective* application. Rather, after *Union Oil,* a claim's status as "pending" will be inconsequential for severance tax calculation purposes. Instead, the nature of the claim will determine whether it survives *ExxonMobil.* In every deficiency action, the *ExxonMobil* valuation formula will apply. Where refunds are sought, however, *ExxonMobil* will have only prospective application, except as to ExxonMobil itself. We acknowledge that this development represents a substantial modification of *ExxonMobil.*

¶ 28 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

¶ 29 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Justice WILKINS' opinion.

---

**2.** *See Parson Asphalt Prods., Inc. v. Utah State Tax Comm'n,* 617 P.2d 397, 398 (Utah 1980) ("Statutes which provide for exemptions should be strictly construed, and one who so claims has the burden of showing his entitlement to the exemption.") (footnotes omitted).